Christopher Sproul (State Bar No. 126398)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376, (510) 847-3467
Facsimile: (415) 358-5695
Email: csproul@enviroadvocates.com

Fredric Evenson (State Bar No. 198059)
ECOLOGY LAW CENTER
~Monterey Bay~
P.O. Box 1000
Santa Cruz, CA 95061
Telephone: (831) 454-8216
Email: evenson@ecologylaw.com

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION,<br><br>                    Plaintiff,<br><br>          v.<br><br>COMMERCIAL SANDBLAST COMPANY,<br><br>                    Defendant. | Civil Case No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et. seq.) |

Los Angeles Waterkeeper ("LA Waterkeeper"), by and through its counsel, hereby alleges:

## I.       JURISDICTION AND VENUE

1.       This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. section 1251 *et seq*. (the "Clean Water Act" or the "CWA"). This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. section 1331 (an action

1  for declaratory and injunctive relief arising under the Constitution and laws of the
2  United States).

3        2.       On May 10, 2019, LA Waterkeeper provided notice of violations of
4  the CWA by Defendant Commercial Sandblast Company (hereinafter "Defendant"
5  or "Commercial Sandblast") and of LA Waterkeeper's intention to file suit against
6  Commercial Sandblast to the Administrator of the United States Environmental
7  Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the
8  Executive Director of the California State Water Resources Control Board ("State
9  Board"); the Executive Officer of the California Regional Water Quality Control
10 Board, Region 4 ("Regional Board"); the U.S. Attorney General, and the Defendant
11 ("Notice Letter") as required by the CWA, 33 U.S.C. § 1365(b)(1)(A).

12       3.       More than sixty days have passed since notice was sent to
13 Commercial Sandblast and the state and federal agencies. Neither the EPA nor the
14 State of California has commenced or is diligently prosecuting a court action to
15 redress the violations alleged in this complaint. No claim in this action is barred by
16 any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. §
17 1319(g).

18       4.       Venue is proper in the Central District of California pursuant to CWA
19 section 505(c)(1), 33 U.S.C. §1365(c)(1), because the source of the violations is
20 located within this judicial district.

21 **II.    INTRODUCTION**

22       5.       This complaint seeks relief for alleged unlawful discharges of
23 pollutants from Commercial Sandblast's facility located 2678 East 26th St., Vernon,
24 CA 90058 ("the Facility") into waters of the United States in violation of the Clean
25 Water Act and the State of California's National Pollution Discharge Elimination
26 System ("NPDES") General Permit No. CAS000001 [California State Water
27 Resources Control Board] Water Quality Order No. 97-03-DWQ ("1997 Permit").
28 This Complaint further addresses Commercial Sandblast's violations of the

predecessor version of the Industrial Stormwater Permit Issued by the California State Water Resources Control Board ("State Board") by Water Quality Order No. 91-013-DWQ (as amended by Order No. 92-116) in 1991/1992 ("1992 Permit") and its violations of the version of Industrial Stormwater Permit issued on April 1, 2014 by State Board Water Quality Order No. 2014-0057-DWQ and effective on July 15, 2015 ("2015 Permit") (note: as context appropriate, the term "Industrial Stormwater Permit" as used herein refers to either of these three versions of the applicable NPDES permit for industrial stormwater discharges in California or collectively to all three versions). All three of these versions of NPDES Permit No. CAS000001 had/have essentially the same terms and conditions. All references to sections of the version of NPDES Permit No. CAS000001 adopted by Water Quality Order No. 2014-0057-DWQ should be construed as equally referring to comparable sections in the State Board's orders adopting the 1992 and 1997 versions of this permit.[1]

6.      Violations of the Clean Water Act and the Industrial Stormwater Permit by small industrial sites are recognized as a leading cause of significant, cumulative impacts to the water quality of the Los Angeles River and the Pacific Ocean. With every rainfall event, hundreds of millions of gallons of polluted rainwater flow off of local industrial facilities, such as Commercial Sandblast's, and pour into storm drains and into the Los Angeles River and the Pacific Ocean. The

---

[1] The version of NPDES Permit No. CAS000001 adopted by Water Quality Order No. 2014-0057-DWQ became effective July 1, 2015 and supersedes the version of this permit adopted by Water Quality Order No. 97-03-DWQ "except for Order 97-03-DWQ's requirement to submit annual reports by July 1, 2015 and except for enforcement purposes." Water Quality Order No. 2014-0057-DWQ at 1 & § I.6 (Findings). Thus, all requirements imposed by Water Quality Order No. 97-03-DWQ will remain in full force and effect after July 1, 2015. However, the requirements imposed by Water Quality Order No. 2014-0057-DWQ also came into effect after July 1, 2015 and Commercial Sandblast's future violations of such Order's imposition of NPDES permit terms essentially identical to those ordered by Water Quality Order No. 97-03-DWQ are also enforceable.

consensus among agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering the aquatic environment each year.

7. Stormwater runs off of industrial sites such as Commercial Sandblast's, causing harm to humans and aquatic life. In particular, stormwater from such industrial facilities contains suspended sediment and heavy metals such as iron, copper, lead and zinc. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological and reproductive effects. Fish are widely used to evaluate the health of aquatic systems because pollutants accumulate in fish, which are an important part of aquatic food chains. Heavy metals have been shown to alter physiological activity in tissues and blood of fish.

8. High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. Suspended solids have been shown to alter predator-prey relationships (for example turbid water can make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and PAHs, are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments.

9. Commercial Sandblast's stormwater discharges contribute to the ongoing stormwater pollution problem and exemplify the epidemic of violations of industrial stormwater permits that LA Waterkeeper is seeking to eliminate or reduce. These pollution discharges can and must be curtailed for the Los Angeles River and the Pacific Ocean to be restored to ecological health.

## III. PARTIES

10. Los Angeles Waterkeeper is a 501(c)(3) public benefit corporation, organized and existing under the laws of the State of California with a principal

office at 120 Broadway, Suite 105, Santa Monica, California 90401. Los Angeles Waterkeeper was founded in 1993 with the mission of preserving, protecting, and defending the inland and coast waters of Los Angeles County from all sources of pollution and degradation.  In pursuit of this mission, Los Angeles Waterkeeper actively seeks federal and state implementation of the Clean Water Act, and where necessary, initiates enforcement actions under the Clean Water Act on behalf of itself and its members. Members of Los Angeles Waterkeeper (including citizens, taxpayers, property owners, and residents) live, work, travel, recreate, own property and homes and reside in Los Angeles County. They use and enjoy the waters into which Commercial Sandblast causes pollutants to be discharged, including the Los Angeles River, other Los Angeles County waterways, and the ocean and beaches into which those waters flow (hereinafter collectively referred to as "impacted waters").  Members of Los Angeles Waterkeeper use these waterways for recreational, educational, aesthetic, and spiritual purposes. Additionally, Los Angeles Waterkeeper and its members use these waters to engage in scientific study through pollution and habitat monitoring and conservation activities.  Commercial Sandblast's alleged discharge of stormwater containing pollutants impairs each of those uses. Thus, the interests of LA Waterkeeper' members have been, are being, and will continue to be adversely affected by the degradation of these waterways resulting from Commercial Sandblast's failure to comply with the Industrial General Permit and the CWA.

11.     Defendant Commercial Sandblast performs abrasive sandblasting, painting, and coating at its Facility in Vernon, California. Industrial activities at the Facility generate dust, toxic metals such as copper, lead, aluminum, iron and zinc; oil and grease; nitrites and nitrates, and TSS and pH-affecting substances. During rainfall events, these substances are entrained into stormwater which flows over and across the facilities and enters the Los Angeles River and the Pacific Ocean.

## IV.    REGULATORY BACKGROUND

**Clean Water Act**

12.     CWA section 301(a), 33 U.S.C. §1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA sections. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

13.     CWA section 402(p) requires that NPDES permits be issued for stormwater discharges associated with industrial activities.

14.     CWA section 402(b) allows each state to administer its own EPA-approved permit program for discharges. In California, the State Board and its nine Regional Boards have approval from EPA to administer an NPDES permit program for the State. The State Board and its nine Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

15.     CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. § 1362(5).

16.     CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33 U.S.C. § 1365(a). CWA violators are also subject to an assessment of civil penalties of up to $37,500 per day per violation for violations occurring from January 12, 2009, to November 2, 2015 and $51,570 per day per violation for violations occurring after November 2, 2015 and assessed on or after August 1, 2016. CWA § 309(d), 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (2016) (Adjustment of Civil Monetary Penalties for Inflation).

**State Regulations**

17.     The Los Angeles River is heavily degraded from pollutant loading.

This is officially recognized by the EPA, the State Board and the Regional Board, which have placed the Los Angeles River on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards. The Regional Board's Basin Plan is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region. Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses. The Basin Plan sets forth narrative water quality objectives for sediment, settable matter, and suspended materials, as well as narrative objectives for not impairing water quality with oil sheens, turbidity, or other nuisance conditions. The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objectives for certain pollutants of concern such as copper, lead, and zinc.

18. In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR"), 40 C.F.R. § 131.38, sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries. The CTR, which applies to the Los Angeles River, includes limits for several toxic metals.

**The General Industrial Stormwater Permit**

19. In California, the State Board has elected to issue a single, statewide general permit applicable to all stormwater discharges associated with industrial activity. The Industrial Stormwater Permit is an NPDES permit pursuant to CWA section 402(p), 33 U.S.C. § 1342(p), the current version of which took effect on July 1, 2015. To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Industrial Stormwater Permit and comply with its terms or obtain and comply with an individual NPDES permit.

20. It is unlawful to discharge pollutants to waters of the United States, such as the Los Angeles River, without an NPDES permit or in violation of the terms and conditions of an NPDES permit.

21.    On June 29, 2016, Commercial Sandblast submitted a Notice of Intent to be authorized to discharge stormwater from its Facility by the Industrial Stormwater Permit and thus at all relevant times has been a permittee subject to the Industrial Stormwater Permit's requirements.

22.    Other than coverage under the Industrial Stormwater Permit, Commercial Sandblast's Facility lacks NPDES permit authorization for any wastewater discharges.

23.    The Industrial Stormwater Permit contains certain absolute prohibitions. Discharge Prohibition III.B of the Industrial Stormwater Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Discharge Prohibition III.C of the Industrial Stormwater Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation VI.B of the Industrial Stormwater Permit prohibits discharges that adversely impact human health or the environment. Receiving Water Limitation VI.A of the Industrial Stormwater Permit prohibits discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

24.    In addition to absolute prohibitions, the Industrial Stormwater Permit contains a variety of substantive and procedural provisions with which dischargers must comply. At a minimum, dischargers must employ measures to reduce or eliminate stormwater pollution that constitute the Best Available Technology Economically Achievable ("BAT") and the Best Conventional Pollutant Control Technology ("BCT"). Industrial Stormwater Permit, Effluent Limitation V.A.

25.    Dischargers must develop and implement a Stormwater Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Industrial Stormwater Permit, X.A. The SWPPP must identify and evaluate sources of

pollutants associated with industrial activities that may affect the quality of storm and authorized non-stormwater discharges from the facility. *Id*. The SWPPP must identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. *Id*. The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. *Id.*, Effluent Limitation ¶ I.D(32)

26.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. *Id.* at X.A.

27.     The Industrial Stormwater Permit also requires facility operators to properly operate and maintain any facilities and systems of treatment and control installed or used to achieve compliance with the conditions of the Industrial Stormwater Permit and requirements of the SWPPP at all times. Industrial Stormwater Permit, XXI.F. The SWPPP and site maps must be assessed and revised as necessary to ensure accuracy and effectiveness. *Id.* at X.B.

28.     Under the 2015 version of the Industrial Stormwater Permit, dischargers are required to prepare and implement a Monitoring Implementation

Plan (MIP) as part of their SWPPP. Industrial Stormwater Permit, Section I. The Monitoring Implementation Plan requirements in the 2015 Permit specify visual observation procedures and locations, sampling procedures, locations, and methods that dischargers must comply with. *Id.*, Sections I; IX. The 1997 Permit's Monitoring and Reporting Program (MRP) required similar actions.[2]

29.     Pursuant to the monitoring and reporting requirements of the Industrial Stormwater Permit, facility operators must conduct ongoing visual observations of stormwater and non-stormwater discharges and record responsive measures taken to eliminate unauthorized non-stormwater and to reduce or prevent pollutants in stormwater and authorized non-stormwater discharges. Industrial Stormwater Permit at XI.A.1.  Facility operators must collect samples of stormwater discharges from *all* locations where stormwater may be discharged from the facility. *Id.* at XI.B.4. Facility operators must submit Annual Reports to the Regional Board accurately reporting their monitoring activity. *Id.* at XVI.A.

## V.    <u>STATEMENT OF FACTS</u>

30.     In much of the Los Angeles area, stormwater drains untreated either directly, or through the storm drain system, into the Los Angeles River and the Pacific Ocean. With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities, pour into the Los Angeles River and the Pacific Ocean.

---

[2] Under the predecessor versions of the Industrial Stormwater Permit, Facility operators were required to develop and implement a monitoring and reporting program ("MRP") when industrial activities begin at a facility. 1997 Industrial Stormwater Permit at ¶ B.1 and Provision ¶ E.3. The MRP must ensure that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial Stormwater Permit. *Id.* at ¶ B.2. The MRP must ensure that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

31.     Commercial Sandblast operates a sandblasting facility that is located just south of East 26th St. and is directly adjacent to the Los Angeles River. As noted, the address for the Facility is 2678 East 26th Street, Vernon, California.

32.     Activities at the Facility include sandblasting, painting, and coating of metal. The operations at the Facility occur outdoors and cause pollutants to be exposed to rainfall. At the Facility, finished and unfinished products, bags of used sand, old parts and equipment, and other miscellaneous items related to Defendant's Facility's activities are stored uncovered in the outdoor portion of the Facility. Stormwater comes into contact with these pollutants at the Facility. Additionally, raw materials are unloaded and finished products are loaded for shipment in the Shipping/Receiving area located centrally toward the northern end of the facility. Dust, debris, and residues are tracked from the covered work/spray booth/blaster areas, the baghouse/compressor/cooling tower areas, covered storage, hazardous materials, and by operational equipment to other areas that contact storm water.

33.      Discharges of stormwater flow off the Facility at one discharge point which then discharges directly into the Los Angeles River, Reach 2.

34.     The Industrial Stormwater Permit requires a discharger to monitor additional parameters if the discharge(s) from its facility contributes pollutants to receiving waters that are listed as impaired for those pollutants (CWA section 303(d) listings). *See* 2015 Permit § VI. A-C and VII.B. The receiving waters that are 303(d) listed as impaired for pollutants that are likely to be associated with industrial stormwater in Applicable Water Quality Standards are set forth in the Basin Plan[3] and the California Toxics Rule[4] ("CTR"). Reach 2 of the Los Angeles River is listed

---

[3] The Basin Plan is published by the Regional Board on the internet at: https://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/electronics_documents/Final%20Chapter%203%20Text.pdf
[4] The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31682

as impaired for copper, zinc, oil, pH, and lead.

35.     Approximately 10% of the Facility is unpaved.  The Facility lacks sufficient and/or sufficiently well-maintained berms or other structural controls to retain stormwater on the Facility. Commercial Sandblast does not sufficiently treat contaminated stormwater prior to discharge from the Facility.

36.     The types of pollutants that the Facility releases into the immediate environment include, among others: dust, toxic metals such as copper, lead, aluminum, iron and zinc; oil and grease; nitrites and nitrates, and TSS and pH-affecting substances. The industrial materials stored, and the pollutants generated, at the Facility are exposed to stormwater flows.

**Commercial Sandblast Activities Contributing to CWA Violations**

37.     Commercial Sandblast has not developed and/or implemented an adequate SWPPP at the Facility in accord with by Section A: Stormwater Pollution Prevention Plan Requirements, ¶ 1 of the 1997 Permit; and by Section X.A-I. of the 2015 Permit.

38.     Commercial Sandblast has failed to prepare, maintain, revise, and implement its SWPPP as required, as evidenced by Commercial Sandblast's stormwater discharges in excess of EPA and State benchmarks.

39.     Commercial Sandblast's SWPPP does not specify adequate BMPs designed to reduce pollutant discharge to BAT and BCT levels in accord with Section A: SWPPP Requirements, ¶ 8 of the 1997 Permit and Section X.A-I. of the 2015 Permit as evidenced by the Facility's continued discharge of stormwater contaminated above pollutant levels attainable via application of BAT and BCT.

40.     Commercial Sandblast has not implemented BMPs that adequately minimize the exposure of pollutants at the Facility to stormwater. Commercial Sandblast has not implemented BMPs at the Facility that adequately control and minimize contaminated runoff from the facility.

41.     Commercial Sandblast has not implemented BMPs at the Facility that

adequately treat and remove pollutants in stormwater prior to discharge.

42.    Commercial Sandblast has not adequately evaluated and revised its SWPPP for the Facility to address these failures. Commercial Sandblast has also failed to fully implement its SWPPP and properly operate and maintain the structures and systems that have been put in place to achieve compliance with the Industrial Stormwater Permit and SWPPP requirements.

43.    Commercial Sandblast has not developed and/or implemented an adequate MIP/MRP at the Facility.

44.    Commercial Sandblast's monitoring and reporting activities have not resulted in practices that adequately reduce or prevent pollutants from discharging into stormwater flows from the Facility.

45.    Commercial Sandblast has failed to complete all of the stormwater sampling required by the Industrial Stormwater Permit at the Facility.

46.    Commercial Sandblast's monitoring activities have not effectively identified compliance problems at the Facility or resulted in effective revision of its SWPPP.

47.    Due to Commercial Sandblast's lack of effective pollution prevention measures, its failure to implement effective best management practices, and its failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents. Dust, toxic metals such as copper, lead, aluminum, iron and zinc; oil and grease; nitrites and nitrates, and TSS and pH-affecting substances become entrained in stormwater when such water flows over and across the outdoor processing areas of the Facilities. This polluted stormwater is discharged to the Los Angeles River, which then flows into the Pacific Ocean.

48.    Commercial Sandblast's own stormwater sampling indicates that Commercial Sandblast's discharges of stormwater from the Facility is consistently contaminated with higher levels of pollutants than is permissible under the Industrial

Stormwater Permit.

## VI.  CLAIMS

### FIRST CLAIM FOR RELIEF

**Discharges in Violation of Technology-Based Effluent Limitations**
**(Violations of 33 U.S.C. § 1311)**

49.     Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

50.     The CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger is in compliance with the terms of a NPDES permit. CWA § 301(a), 33 U.S.C. § 1311(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities). The Facility discharges stormwater associated with industrial activity to the Los Angeles River and the Pacific Ocean, both of which are contaminated with pollutants. The Facility discharges stormwater pursuant to the Industrial Stormwater Permit, which authorizes these discharges conditioned on the Facility complying with the terms of the Industrial Stormwater Permit. Each of these permit terms constitutes an "effluent limitation" within the meaning of CWA section 505(f), 33 U.S.C. § 1365(f). The Facility's stormwater discharges have violated numerous of these permit terms, thereby violating CWA effluent limitations.

51.     The Effluent Limitations of the 2015 Permit, § V.A. and the 1997 Permit, ¶ B.3, prohibit the Facility from discharging pollutants above the level commensurate with the application of BAT and BCT. On every day the Facility has existed since at least February 29, 1992, Commercial Sandblast has been discharging polluted stormwater from the Facility containing levels of pollutants above the level commensurate with the application of BAT and BCT in violation of the Effluent Limitations of the Industrial Stormwater Permit during every significant rain event (defined by the United States Environmental Protection Agency as a rainfall event

generating 0.1 inches or more of rain). Significant local rain events are reflected in the rain gauge data available at https://www.ncdc.noaa.gov/cdo-web/search. Table 2 set forth at the conclusion of this Complaint lists the rainfall data since June 2011 as reported to the Los Angeles Downtown monitoring station, the closest monitoring station available on the NOAA website.

52.     EPA and the State Board have published Benchmark Values set at the maximum level of pollutant loading generally expected if an industrial facility is employing BAT and BCT (which are set forth in Table 1). In the 2015 Permit, the State Board has established Numeric Action Limits (NALs) (set forth in Table 1 set forth at the end of this Complaint) which serve a similar purpose.

53.     As reflected in Table 1, the Facility has repeatedly discharged stormwater from the discharge location ("outfall") identified in its SWPPP containing pollutant levels exceeding these Benchmark Values and NALs, which establishes that the Facility has discharged pollutants above a level commensurate with application of BAT and BCT.[5] Table 1 compiles some of the self-monitoring data reported by the Facility to the Regional Board reflecting the Facility's sampling of actual stormwater discharges. The sample results reflected in Table 1 are representative of the pollutant levels in the Facility's discharge of stormwater, including such discharges that Commercial Sandblast did not sample or analyze. Thus, every instance when the Facility has discharged stormwater, including instances when the Facility has discharged stormwater that it has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Table 1. Such polluted stormwater discharges from the Facility have occurred during every significant rain event during which the Facility has existed since at least August 2, 1993.

54.     LA Waterkeeper further alleges that on each day that Commercial

Sandblast has discharged stormwater, Commercial Sandblast has discharged stormwater that was not treated to a level commensurate with BAT or BCT in violation of the 2015 Permit, § V.A., and the 1997 Permit, ¶ B.3., because, as further alleged in the Third Claim, below, Commercial Sandblast has not developed and implemented a SWPPP that mandates BMPs that are commensurate with BAT and BCT for the Facility.

55.     Unlawful discharges of stormwater from the Facility with levels of pollutants exceeding BAT and BCT levels of control continue to occur presently and will occur in the future during all significant rain events.

56.     Each discharge of stormwater from the Facility after the effective date of the Industrial Stormwater Permit has constituted and will constitute a separate violation of the Industrial Stormwater Permit's Effluent Limitations and the CWA. Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Commercial Sandblast has discharged or will discharge polluted stormwater from the Facility in violation of the Effluent Limitations of the of the 2015 Permit, § V.A., and the 1997 Permit, ¶ B.3., is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Commercial Sandblast to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

## SECOND CLAIM FOR RELIEF

### Discharges of in Violation of Water Quality-Based Effluent Limitations
### (Violations of 33 U.S.C. § 1311)

57.     Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

58.     The Discharge Prohibitions of the Industrial Stormwater Permit, III.C, prohibit stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. The Receiving Water Limitations of the Industrial Stormwater Permit, VI.B, prohibit stormwater discharges to surface or groundwater

that adversely impact human health or the environment. The Receiving Water Limitations of the Industrial Stormwater Permit, VI.A, prohibit stormwater discharges that cause or contribute to an exceedance of applicable Water Quality Standards. Applicable Water Quality Standards are set forth in the Basin Plan and the CTR.

The Basin Plan, *inter alia*, establishes the following Water Quality Standards for the Los Angeles River:

a. Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses. Basin Plan at 3-38.

b. Waters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses. *Id.* at 3-37.

c. Waters shall not contain oils, greases, waxes or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses. *Id.* at 3-29.

d. The pH of inland surface waters shall not be depressed below 6.5 or raised above 8.5 as a result of waste discharges. Ambient pH levels shall not be changed more than 0.5 units from natural conditions as a result of waste discharge. *Id.* at 3-35.

59.     The Basin Plan further establishes numeric water quality criteria for copper, lead, and zinc.

60.     The CTR establishes a freshwater continuous concentration criterion limit for zinc of 120 micrograms per liter.

61.     Commercial Sandblast's discharges of stormwater from the Facility from discharge locations ("outfall") identified in Commercial Sandblast's SWPPP have caused or contributed to an exceedance of one or more of the above-listed Water Quality Standards. Table 1 compiles some of the self-monitoring data

reported by the Facility to the Regional Board reflecting the Facility's sampling of stormwater discharges. The sample results reflected in Table 1 is representative of the pollutant levels in the Facility's discharge of stormwater, including such discharges that Commercial Sandblast did not sample or analyze. Thus, every instance when the Facility has discharged stormwater, including instances when the Facility has discharged stormwater that Commercial Sandblast has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Table 1. Table 1 indicates that the Facility routinely discharges stormwater to the Los Angeles River containing, *inter alia*, the following pollutants: zinc, iron, oil and grease, aluminum, and total suspended solids. The levels of these pollutants in the Facility's stormwater discharges have caused pollution, contamination, or nuisance in violation of the Discharge Prohibitions of the Industrial Stormwater Permit, III.C and have adversely impacted the environment in violation of the Receiving Water Limitations of the Industrial Stormwater Permit, VI.B. Moreover, the discharge of these pollutants has caused the Los Angeles River not to attain or contributed to these waters not attaining one or more applicable Water Quality Standards in violation of the Receiving Water Limitations of the Industrial Stormwater Permit, VI.A.

62. Specifically, the Facility's discharge of excessive TSS has caused or contributed to the Los Angeles River, Reach 2, not meeting applicable Water Quality Standards in the Basin Plan for levels of suspended sediment and turbidity. The Facility's discharge of stormwater containing suspended and settleable toxic metals and other materials has contributed to the deposition and/or dispersal of materials that interfere with beneficial uses of the Los Angeles River and a detrimental increase in concentrations of toxic substances found in bottom sediments or aquatic life due to bioaccumulation. The Facility's discharges of zinc, iron, and aluminum have caused the Los Angeles River to exceed Water Quality Criteria established by the CTR and Basin Plan for these pollutants.

63.     LA Waterkeeper alleges and puts Commercial Sandblast on notice that each day that Commercial Sandblast discharged stormwater from the Facility, Commercial Sandblast's stormwater contained levels of pollutants on par with the levels set forth in Table 1 and thus caused levels of pollutants to exceed one or more of the applicable Water Quality Standards in the Los Angeles River. Every day that the Facility has been in existence since the effective date of the above-referenced Water Quality Standards, which date back at least to 1986 in most instances and to May 24, 2000 for the CTR's limit on copper, lead, and zinc, Commercial Sandblast has discharged stormwater from the Facility during at least every significant local rain event over 0.1 inches that has caused or contributed to Water Quality Standards not being met in the Los Angeles River. Significant local rain events are reflected in the rain gauge data available at https://www.ncdc.noaa.gov/cdo-web/search. Table 2 lists the rainfall data since June 2011 as reported to the Los Angeles Downtown monitoring station, the closest monitoring station available on the NOAA website.

64.     Commercial Sandblast's unlawful discharges from the Facility continue to occur presently and will occur in the future during all significant rain events. Each discharge of stormwater from the Facility after the effective date of the Industrial Stormwater Permit has constituted and will constitute a separate violation of the Discharge Prohibitions of the 2015 Permit, III.C, and 1997 Permit, ¶ A.2, and/or the Receiving Water Limitations of the 2015 Permit, VI.A and B, and the 1997 Permit, ¶ C.1, and the CWA. Every day since June 17, 2014 (five years and sixty days before the date Plaintiff filed this Complaint) that Commercial Sandblast has discharged or will discharge polluted stormwater from the Facility in violation of Discharge Prohibitions of the 2015 Permit, III.C and the 1997 Permit, ¶ A.2 and/or the Receiving Water Limitations of the 2015 Permit, VI.A and B and the 1997 Permit, ¶ C.1, is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Commercial Sandblast to an assessment of civil

1  penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and
2  1365.

### THIRD CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate Stormwater
Pollution Prevention Plan
(Violations of 33 U.S.C. § 1311)**

65.     Plaintiffs incorporate the allegations contained in all preceding
paragraphs as though fully set forth herein.

66.     Commercial Sandblast has failed to develop and implement an
adequate SWPPP or implement all necessary revisions to the SWPPP for the
Facility as required by the 1992 Permit, Section A: Stormwater Pollution
Prevention Plan Requirements, ¶ 1. The 1997 Permit, ¶ C.1 also requires
dischargers to make all necessary revisions to existing SWPPPs promptly, and in
any case no later than August 1, 1997. 1997 Permit ¶ E.2.  The 2015 Permit
contains essentially identical SWPPP requirements, but with a new set of minimum
BMPs and additional Advanced BMPs. *See* 2015 Permit § X.A-I.

67.     Commercial Sandblast has failed to prepare, maintain, revise and
implement Commercial Sandblast's SWPPP as required, as evidenced by
stormwater discharges that exceed EPA and State benchmarks and contribute to
violations of Water Quality Standards in receiving waters. Commercial Sandblast's
SWPPP does not specify adequate BMPs designed to reduce pollutant discharge to
BAT and BCT levels in accord with Section A: SWPPP Requirements, ¶ 8 of the
1997 Permit and Section X.A-I. of the 2015 Permit as evidenced by the Facility's
continued discharge of stormwater contaminated above pollutant levels attainable
via application of BAT and BCT.

68.     Commercial Sandblast's failures to draft an adequate SWPPP, and/or
to revise, and/or to implement Commercial Sandblast's SWPPP in all the above
respects are in violation of the requirements of Section A of the 1997 Permit and
Section X of the 2015 Permit. Commercial Sandblast was required to have prepared

and implemented an adequate SWPPP by no later than October 1, 1992 pursuant to the 1992 Permit issued by the State Board, by Section A of the 1997 Permit and Section X of the 2015 Permit. Therefore, Commercial Sandblast has been in daily and continuous violation of the Industrial Stormwater Permit's requirement to develop and implement an adequate SWPPP for the Facility on each and every day since October 1, 1992 that Commercial Sandblast has maintained the Facility. Commercial Sandblast will continue to be in violation every day that Commercial Sandblast fails to develop and implement an adequate SWPPP.

69.     Every day since June 9, 2014 that Commercial Sandblast has failed to draft an adequate SWPPP, and/or to revise, and/or to implement Commercial Sandblast's SWPPP in violation of the requirements of Section A of the 1997 Permit and Section X of the current Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Commercial Sandblast to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

## FOURTH CLAIM FOR RELIEF

### Failure to Develop and Implement an Adequate
### Monitoring and Reporting Program/Monitoring and Implementation Program
### (Violations of 33 U.S.C. § 1311)

70.     Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

71.     Commercial Sandblast has failed to develop and implement an adequate monitoring and reporting program ("MRP") and implement all necessary revisions to the MRP at the Facility as required by Section B and Provision ¶ E.3 of the 1997 Permit. The 2015 Permit replaced the MRP requirements with substantially similar MIP (monitoring and implementation program) requirements.

72.     Commercial Sandblast is required to comply with the Industrial Stormwater Permit's requirements concerning the timing of Commercial Sandblast's sampling events and the outfalls Commercial Sandblast must sample. Commercial

Sandblast is further required to comply with the provisions in Commercial Sandblast's SWPPP concerning the outfalls Commercial Sandblast must sample and the pollutants Commercial Sandblast must analyze. Any failure to comply with an SWPPP also constitutes a violation of Section A, ¶ 1 of the 1997 Permit and a violation of Section X.A of the 2015 Permit.

73.     The 2015 Permit provides that the discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS. 2015 Permit, XVI; 1997 Permit, B(14).  The permit further provides that "the Discharger shall include in the Annual Report: 1. A Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit; 2. An explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist; 3. An identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year; and, 4. The date(s) of the Annual Evaluation."

74.     Commercial Sandblast's SWPPP provides that it must collect and analyze stormwater samples from two qualifying storm events (QSEs) within the first half of each reporting year (July 1 to December 31) and 2 QSEs within the second half of each reporting year (January 1 to June 30), for a total of four samples, as required by the 2015 Permit. The 1997 Permit required facility operators to sample the first QSE of the wet season (October 1 to May 30)  and one additional QSE during the wet season. 1997 Permit, Section B(5)(a).  Commercial Sandblast's SWPPP further provides that "In the event that samples are not collected or visual observations are not conducted due to approved exceptions, an explanation shall be included in the Annual Report." While there have been several qualifying storm events in the past 5 years and beyond (*see* Table 2), Commercial

Sandblast has failed to sample the required number of stormwater discharges during these events, in violation of the Industrial Stormwater Permit.

75.     Commercial Sandblast did not collect any samples between 2011 and 2016. Commercial Sandblast's Annual Report for the 2011-2012 year reported zero sampling, which it explained was because "We did not have an opportunity to perform our samples because rain events occurred during non-business hours, there was insufficient discharge to perform sampling, there was not three dry working days between events, or there was no qualifying rain event for the month." Commercial Sandblast's annual report for the 2012-2013 year also reported zero sampling, because "We did not have an opportunity to collect samples as there was insufficient or no runoff (scattered rain), the rain occurred outside of business hours, the facility was already discharging prior to arriving to work, three dry working days did not pass between rain events, or there was no qualifying rain event for the month." Commercial Sandblast's annual report for the 2014-2015 year reported zero sampling, because "We did not have an opportunity to perform sampling because the first hour of discharge occurred during non-business hours, there was insufficient discharge to perform sampling, there were not three dry working days between rain events, there was no qualifying rain event for the month, or no rain event took place for the month." Commercial Sandblast's Annual Report for the 2015-2016 year reported zero sampling, because "Due to light rain events, storm water samples were not collected. The facility requires large rain events to produce large discharge, to be able to fill the drain inlet, and make it into the large drain pipe." After 2015, Commercial Sandblast still failed to collect the required number of samples. For the years 2017 and 2018, it submitted results of only three sampling events to SMARTS (February 17, 2017, March 22, 2018, and December 6, 2018). For the 2017-2018 year, Commercial Sandblast reported only one sampling event because there was "only one QSE during operation hours for this reporting year." For the 2018-2019 year, Commercial Sandblast reported only two

1   sampling events because there were "Only 2 QSE during operating hours with

2   sufficient drainage for lab analysis for reporting year." Table 3 is a list of all

3   working days (Monday-Friday) from June 2011 to March 2019 with more than 0.1

4   inches of rainfall (i.e., days that were available to take samples).

5       76.     Commercial Sandblast's MIP must provide for analysis of

6   stormwater samples for TSS, pH, and total oil and grease. In addition, Commercial

7   Sandblast's MIP must provide for analysis of stormwater samples for the other

8   analytical parameters listed in the Industrial Stormwater Permit's Table 1.

9   Commercial Sandblast's SWPPP indicates that its SIC code is 3471, which would

10  obligate it under this Table 1 to analyze stormwater samples for zinc, nitrates and

11  nitrites, iron, and aluminum. Commercial Sandblast must in any case analyze its

12  samples at least for all of the polluting parameters identified in its SWPPP. 1997

13  Permit, Section B: MRP, ¶ 1; 2015 Permit, XI.B(6).  Commercial Sandblast's

14  SWPPP/MIP identifies the following pollutants as those it will analyze its

15  stormwater discharges for: pH Level, Oil and Grease, Total Suspended Solids,

16  Nitrates and Nitrites, Total Aluminum, Total Iron, and Total Zinc.

17      77.     Commercial Sandblast has failed to implement its MIP and/or a MIP

18  that would be compliant with the Industrial Stormwater Permit. Commercial

19  Sandblast has not analyzed all of the pollutant parameters listed in the above

20  paragraph in each of the stormwater runoff events from its Facility that it was

21  required to take samples of. Specifically, Commercial Sandblast failed to conduct

22  any sampling at all for the years 2011-2016. Additionally, Commercial Sandblast

23  failed take the required number of samples in years 2016-2017 and 2017-2018 and

24  failed to explain this deficiency.

25      78.     Because Reach 2 of the Los Angeles River is impaired for both

26  copper and lead, and, on information and belief, Commercial Sandblast's Facility

27  engages in the sandblasting of metal, which involves grinding materials containing

28  copper and lead into a fine powder which is accessible to stormwater, Commercial

Sandblast is required to retain documentation that copper and lead are not present at its Facility. 2015 Industrial Stormwater Permit, §VII.B. Commercial Sandblast has failed to show that the pollutants copper and lead are not present at the Facility, and has failed to monitor the Facility's stormwater discharges for copper and lead. Additionally, because Commercial Sandblast has not shown that copper and lead are not present at its Facility, Commercial Sandblast is required to analyze its stormwater samples for copper and lead. 2015 Industrial Stormwater Permit §XI.B; §X.G.2.ix.

79.     As alleged in the preceding paragraphs, Commercial Sandblast has not developed and implemented an adequate MIP/MRP. Commercial Sandblast was required to have prepared and implemented an adequate MRP by no later than October 1, 1992 pursuant to the 1992 Permit issued by the State Board and by Section B: Monitoring Program and Reporting Requirements, ¶ 1.a. of the 1997 Industrial Stormwater Permit. Therefore, Commercial Sandblast has been in daily and continuous violation of the monitoring and reporting requirements of the Industrial Stormwater Permit set forth in Section B: MRP Requirements every day since October 1, 1992 (or whenever the Facility began operation, whichever is later) to July 1, 2015, when the MRP was replaced by the substantially similar MIP requirements. Therefore, Commercial Sandblast will continue to be in violation every day after July 1, 2015 that it fails to develop and implement an adequate MIP for the Facility. Commercial Sandblast is subject to penalties for violations of the Industrial Stormwater Permit and the CWA occurring within the past five (5) years.

80.     As further discussed above, Commercial Sandblast has not submitted accurate and complete Annual Reports and reports of Commercial Sandblast's noncompliance with the Industrial Stormwater Permit. Therefore, Commercial Sandblast has been in daily and continuous violation of the reporting requirements of the 2015 Industrial Stormwater Permit, Section XVI, and the 1997 Permit, MRP Requirements, ¶ 14 and Section C: Standard Provisions, ¶¶ 9 and 10 every day

since each of Commercial Sandblast's Annual Reports were due.

81.     Every day since at least five years and sixty days before the date Plaintiff filed this Complaint until July 1, 2015 that Commercial Sandblast has failed to prepare and implement an adequate MRP as required by Section B: Monitoring Program and Reporting Requirements or comply with the reporting requirements of the Industrial Stormwater Permit, Section B: MRP Requirements, ¶ 14 and Section C: Standard Provisions, ¶¶ 9 and 10 is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Commercial Sandblast to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

82.     Every day since July 1, 2015 that Commercial Sandblast has failed to prepare and implement an adequate MIP as required by the 2015 Permit, Section XVI, is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Commercial Sandblast to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

83.     An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged in LA Waterkeeper's First through Fourth Claims above will irreparably harm LA Waterkeeper and LA Waterkeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Commercial Sandblast as set forth hereafter.

## VII.     <u>RELIEF REQUESTED</u>

84.     Wherefore, LA Waterkeeper respectfully requests this Court to grant the following relief:

a.          Declare Defendant to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. §

1342 and for failing to comply with all substantive and procedural requirements of the Industrial Stormwater Permit and the CWA;

      b.      Enjoin Defendant from discharging pollutants from its Facility to the Los Angeles River and the Pacific Ocean.

      c.      Enjoin Defendant to restore all receiving waters damaged by Defendant's illegal discharges of pollutants from the Facility;

      d.      Enjoin Defendant from violating the substantive and procedural requirements of the Industrial Stormwater Permit at the Facility;

      e.      Order Defendant to pay civil penalties of up to $37,500 per day per violation for violations occurring from January 12, 2009, to November 2, 2015 and $51,570 per day per violation for violations occurring after November 2, 2015 and assessed on or after August 1, 2016. ; CWA § 309(d), 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (2016) (Adjustment of Civil Monetary Penalties for Inflation).

      f.      Award Plaintiff its costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA, 33 U.S.C. § 1365(d); and

      g.      Award such other relief as this Court may deem appropriate.

## VII. DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS

Based on LA Waterkeeper' knowledge to date, pursuant to Civil Local Rule 3-16, the undersigned certifies that, as of this date, other than the named parties, there is no such interest to report.

Dated: August 19, 2019          ENVIRONMENTAL ADVOCATES

*Christopher a. sproul*

_____
Christopher Sproul, Attorney for
Plaintiff LOS ANGELES
WATERKEEPER

# TABLE 1

| Date | Pollutant | Result (mg/L) | Numeric Action Level (NAL) (mg/L) | EPA Benchmark (mg/L) | CA Toxics Rule (40 CFR § 131.38) (mg/L) |
|---|---|---|---|---|---|
| Attachment 1: Sampling Results from Commercial Sandblast Company Facility at 2678 East 26th Street, Vernon, CA. | | | | | |
| 2/17/17 | Zinc (total recoverable) | 11 | 0.26 | 0.117 | 0.12 |
| 2/17/17 | Nitrite + Nitrate | 0.22 | 0.68 | 0.68 | |
| 2/17/17 | Iron | 18 | 1 | 1 | |
| 2/17/17 | TSS | 500 | 100 | 100 | |
| 2/17/17 | Oil and Grease | 10.2 | 15 | | |
| 2/17/17 | Aluminum | 8.6 | 0.75 | 0.75 | |
| 2/17/17 | pH | 7 | 6 to 9 pH units | 6 to 9 pH units | |
| 3/22/18 | Zinc (total recoverable) | 5.81 | 0.26 | 0.117 | 0.12 |
| 3/22/18 | Nitrite + Nitrate | 0.102 | 0.68 | 0.68 | |
| 3/22/18 | Iron | 0.175 | 1 | 1 | |
| 3/22/18 | TSS | 108 | 100 | 100 | |
| 3/22/18 | Oil and Grease | 3.22 | 15 | | |
| 3/22/18 | Aluminum | 0.0845 | 0.75 | 0.75 | |
| 3/22/18 | pH | 6 | 6 to 9 pH units | 6 to 9 pH units | |
| 12/6/18 | Zinc (total recoverable) | 7.69 | 0.26 | 0.117 | 0.12 |
| 12/6/18 | Nitrite + Nitrate | 0.23 | 0.68 | 0.68 | |
| 12/6/18 | Iron | 3.82 | 1 | 1 | |
| 12/6/18 | TSS | 8.9 | 100 | 100 | |
| 12/6/18 | Oil and Grease | 10.8 | 15 | | |
| 12/6/18 | Aluminum | 0.0722 | 0.75 | 0.75 | |
| 12/6/18 | pH | 2 | 6 to 9 pH units | 6 to 9 pH units | |

# TABLE 2

**Attachment 2: Alleged Dates of Commercial Sandblast Co's Violations: June 2011 to March 2019**

Days with Precipitation One-Tenth of an Inch or Greater, As Reported by NOAA's National Climatic Data Center, Los Angeles Downtown Station, available at https://www.climate.gov/maps-data/dataset/past-weather-zip-code-data-table

| DATE | RAINFALL (INCHES) |
|---|---|
| 10/5/2011 | 1.15 |
| 11/4/2011 | 0.16 |
| 12/12/2011 | 0.79 |
| 12/13/2011 | 0.17 |
| 1/23/2012 | 0.62 |
| 2/15/2012 | 0.13 |
| 4/10/2012 | 0.15 |
| 4/11/2012 | 0.58 |
| 4/13/2012 | 0.49 |
| 4/25/2012 | 0.2 |
| 4/26/2012 | 0.29 |
| 11/29/2012 | 0.21 |
| 11/30/2012 | 0.46 |
| 12/3/2012 | 0.19 |
| 12/18/2012 | 0.43 |
| 12/24/2012 | 0.46 |
| 12/26/2012 | 0.33 |
| 1/24/2013 | 0.79 |
| 1/25/2013 | 0.17 |
| 2/19/2013 | 0.18 |
| 3/8/2013 | 0.49 |
| 5/6/2013 | 0.69 |
| 11/21/2013 | 0.29 |
| 11/29/2013 | 0.23 |
| 12/19/2013 | 0.11 |
| 2/27/2014 | 1.05 |
| 2/28/2014 | 2.24 |
| 4/1/2014 | 0.25 |
| 10/31/2014 | 0.25 |
| 12/2/2014 | 1.21 |
| 12/3/2014 | 0.31 |
| 12/12/2014 | 1.6 |
| 12/16/2014 | 0.41 |
| 12/17/2014 | 0.15 |
| 12/30/2014 | 0.19 |
| 3/2/2015 | 0.21 |
| 4/7/2015 | 0.13 |
| 5/8/2015 | 0.18 |
| 5/14/2015 | 0.69 |
| 9/15/2015 | 2.39 |
| 10/5/2015 | 0.4 |
| 1/5/2016 | 1.61 |
| 1/6/2016 | 0.8 |
| 1/7/2016 | 0.3 |
| 2/17/2016 | 0.58 |
| 2/18/2016 | 0.21 |
| 3/7/2016 | 0.38 |
| 3/11/2016 | 0.52 |
| 4/8/2016 | 0.14 |
| 10/17/2016 | 0.34 |
| 11/21/2016 | 0.2 |
| 12/15/2016 | 0.43 |
| 12/16/2016 | 1.33 |

| | |
|---|---|
| 12/21/2016 | 0.5 |
| 12/22/2016 | 0.27 |
| 12/23/2016 | 1.41 |
| 12/30/2016 | 0.39 |
| 1/5/2017 | 0.39 |
| 1/9/2017 | 0.77 |
| 1/11/2017 | 0.39 |
| 1/12/2017 | 1.13 |
| 1/19/2017 | 0.98 |
| 1/20/2017 | 1.51 |
| 1/23/2017 | 0.33 |
| 2/3/2017 | 0.23 |
| 2/6/2017 | 0.88 |
| 2/7/2017 | 0.27 |
| 2/10/2017 | 0.3 |
| 2/17/2017 | 2.01 |
| 10/20/2017 | 0.1 |
| 1/8/2018 | 0.32 |
| 1/9/2018 | 1.45 |
| 3/2/2018 | 0.51 |
| 3/15/2018 | 0.17 |
| 3/16/2018 | 0.1 |
| 3/21/2018 | 0.65 |
| 3/22/2018 | 0.56 |
| 10/12/2018 | 0.42 |
| 11/22/2018 | 0.42 |
| 11/29/2018 | 1.02 |
| 12/5/2018 | 0.2 |
| 12/6/2018 | 1.91 |
| 1/7/2019 | 0.2 |
| 1/14/2019 | 1 |
| 1/15/2019 | 0.55 |
| 1/16/2019 | 0.99 |
| 1/17/2019 | 0.93 |
| 1/31/2019 | 0.99 |
| 2/4/2019 | 0.27 |
| 2/5/2019 | 0.24 |
| 2/14/2019 | 2.12 |
| 2/15/2019 | 0.18 |
| 3/6/2019 | 1.25 |